UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA

                                               **Hon. Hugh B. Scott**

                v.                                    03CR167S

                                                **Report**
                                                    **&**
                                             **Recommendation**

Curtis Vance and Dorian Jennings,

                  Defendants.

Before the court are the defendants' omnibus motions (Docket Nos. 58 & 61) which seek, among other things, the suppression of evidence.[1]

**Background**

The defendants, Curtis Vance ("Vance") and Dorian Jennings ("Jennings"), have been charged with conspiring with others to possess with the intent to distribute a substance containing cocaine and attempted possession of cocaine in violation of 21 U.S.C. §846. (Docket No. 49).

Some time in late July of 2003, a confidential source ("CS") working with the government and an undercover agent began negotiations with Lamont Jackson and Sydney Stokes in Los Angeles, California regarding the purchase of a large quantity of cocaine from the

---

[1] The discovery issues raised are addressed in a separate Decision & Order.

1

informant and agent. Alvaro Murillo, a police officer employed in Huntington Park, California was the agent involved in the reverse sting operation. Following discussions as to the amount of cocaine and the price, Murillo testified that it was agreed that a portion of the cocaine would be delivered in Buffalo on August 2, 2003, where it would be picked up and paid for by Jackson and Stokes. (R. 6).[2]

On August 2, 2003, Murillo, Jackson, Stokes and the CS all met at the Holiday Inn Hotel on Delaware Avenue in Buffalo. According to Murillo, it had been agreed that 30 kilograms of cocaine would be delivered to Stokes and Jackson once he and the CS were assured that the funds to pay for the cocaine had been delivered to the Holiday Inn. (R. 7). Unbeknownst to Stokes and Jackson, various law enforcement officers, including Jeffrie Ludwick ("Ludwick"), Michael McParlane ("McParlane") and Stephen Will ("Will") were present to assist in the reverse sting operation. Pursuant to the sting, once Murillo was certain that the money to purchase the drugs was present, he would give a signal for the officers to come in and make the arrests (referred to as "the takedown"). (R. 109).

Murillo, Jackson, Stokes and the CS met in the parking lot of the Holiday Inn. Murillo was advised that the money for the purchase was "en route." (R. 10). The four men waited in the hotel bar/restaurant for the money to arrive. (R. 11). At approximately 7:50 p.m., DEA agent Will, who conducted surveillance from an upper floor window from a building directly across the street from the hotel parking lot, observed co-defendant Markel Curry ("Curry") arrive at the Holiday Inn in a green minivan. (R. 130). According to Will, Curry walked into the hotel

---

[2] References to the transcript of the Suppression Hearing held on October 4, 2005 and October 21, 2005 are designated as "(R. __)."

carrying a black duffel bag. (Id). Curry was also observed by Murillo inside the Hotel. (R. 12, 24). Stokes left the hotel bar to meet with Curry in Stokes' room at the hotel. A few minutes later, Stokes advised Murillo by phone that only half of the money was there (R. 13-14). Stokes told Murillo that "the money guy" was on his way downstairs to pick up the other half. (R. 14). Murillo testified that he then saw Curry get off the elevator, at which point Jackson (who was still sitting with Murillo) pointed to Curry and said "that's the money guy." (R. 14).

According to Will, at approximately 8:52 p.m., he observed a white van pull into the hotel parking lot and parked in front of the green minivan. (R. 132). Will testified that he saw Curry conversing with the driver of the white van. (R. 133). At some point, Curry walked around the other side of the white van and the van drove around to the back of the hotel out of Will's view. (R. 134). McParlane drove his vehicle toward the back of the hotel where the white van had parked and observed Curry[3] speaking with the driver of the van, later identified as Vance. (R. 91). McParlane saw Curry go to the passenger side of the white van and open the door. (R. 93). Based on what he observed, McParlane advised the other agents that the white van was involved in the transaction. (R. 52). Will and Ludwick then observed Vance driving out of the hotel parking lot, pulling into the parking lot of a Walgreen's drug store next door. (R. 52, 135). It was determined that once the "takedown" signal was given, Ludwick and McParlane would "find out who the occupant of the white van" was. (R. 54). McParlane, had pulled out of the hotel parking lot, proceeded a short distance on Delaware Avenue, and circled back to the Walgreen's parking lot. (R. 95-96, 103). He testified that he observed Vance get out of his van,

---

[3] Officer McParlane testified that he was familiar with Curry from previous investigations. (R.. 92).

walk toward the North Street section of the lot along side the drugstore. As he was walking back to his vehicle, a Ford Explorer[4] pulled into the parking lot and parked next to Vance's white van. Vance then had a conversation with Jennings, who was later determined to be the driver of the Explorer. (R. 97, 55).

According to Murillo, after Curry walked out of the hotel, Stokes also left the hotel with a suitcase. (R. 14-15). Shortly thereafter, Stokes telephoned Jackson and advised that the money had arrived. (R. 15). Jackson, Murillo and the CS proceeded outside to take the next step in the transaction. The CS and Stokes went to the back of Stokes' vehicle, and the CS confirmed to Murillo that all the money was there. At that point, Murillo gave the signal to the surveillance officers that it was time to move in. (R. 16).

The takedown signal was given by Murillo at approximately 9:07 p.m. At that point, Ludwick and McParlane testified that they saw the rear backup lights come on for the vehicles driven by Vance and Jennings. (R. 54, 99).

Ludwick pulled his vehicle behind Jennings' Explorer (R. 55). Ludwick approached Jennings vehicle with his gun drawn and identified himself as a Drug Enforcement Agency ("DEA") agent; he asked Jennings to get out of the car; Ludwick holstered his gun; he observed that Jennings had something bulky in his pocket; Ludwick performed a pat down and asked permission to search Jennings pockets; Jennings allegedly nodded his consent; Ludwick seized a cell phone, a pager and currency ($1000.00 in $20 dollar bills) from Jennings' pockets. (R. 55-

---

[4] In his motion papers, Jennings suggests that he was driving a Chevy Blazer, not a Ford Explorer. (Docket No. 58 at page 18). This discrepancy was not addressed during the suppression hearing, and there does not appear to be a question as to the vehicle driven by Jennings at the time in question.

57, 61, 72).  Ludwick testified that he told Jennings to stay out of his vehicle while Ludwick pulled his car into the parking space next to the Explorer. (R. 58).  Jennings was not handcuffed at this time. (Id).  Ludwick stated that he advised Jennings that they were investigating an event "next door" and wanted to find out if he had any involvement. (Id.).  Ludwick asked Jennings was he was doing there. According to Ludwick, Jennings stated that his friend's van had broken down and he came to give him a jump. (Id).  Ludwick and McParlane both testified that at no time did they see the hoods of either vehicle go up as would be necessary if Jennings was to give Vance's van a jump. (R. 59, 98).  Ludwick asked Jennings if he knew Curry; Jennings allegedly responded that he did. (Id). Ludwick acknowledged that he did not read Jennings his Miranda[5] rights before questioning him at the scene. (R. 74).   Because Ludwick did not observe Jennings attempt to provide a jump to Vance's vehicle, and because he stated that he knew Curry, Ludwick stated that he thought Jennings was possibly there as a scout or lookout for the transaction. (R. 60).  Ludwick stated that he then placed Jennings under arrest and put him into a Buffalo police cruiser. (R. 60-61).  Ludwick then seized another cell phone from the center console of the Explorer. (R. 61).

While Ludwick was confronting Jennings, McParlane pulled his car behind the white van; he advised Vance that he was a police officer; took Vance out of the car and handcuffed him. (R. 99).  Based upon his observations, McParlane stated that he determined that Vance was a lookout connected to the transaction in the hotel parking lot next door. (R. 100).  McParlane testified that he held Vance at the scene but did not question him, or read Vance his Miranda rights. (R. 99, 118).   Ludwick approached McParlane and Vance.  He proceeded to

---

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

search Vance's pockets finding currency, a cell phone, and a roll of quarters. (R. 62).  Ludwick stated that he asked Vance if he knew Curry and he said that he did. (R. 84).  Ludwick testified that he did not advise Vance of his Miranda rights prior to asking whether Vance knew Curry. (R. 87).

On August 4, 2003, a Criminal complaint was filed in this Court charging Curry, Jennings[6] and Vance with a conspiracy to attempt to possess cocaine with the intent to distribute in connection with the events of August 2, 2003.[7]  On August 20, 2003, Curry was indicted by the grand jury in connection with his role in the August 2, 2003 transaction at the Holiday Inn parking lot. On September 19, 2003, the Criminal complaint was voluntarily dismissed by the government as to Jennings and Vance under Rule 48(a) of the Federal Rules of Criminal Procedure. A Superceding Indictment was issued against Curry on December 15, 2004. (Docket No. 37).  On December 14, 2004, the government obtained a series of warrants to search the various telephone and pagers confiscated from the individuals, including Vance and Jennings, arrested on August 2, 2003.  The warrants were based upon the affidavit of DEA Special Agent David Lauer dated December 14, 2004.  A Second Superceding Indictment was issued on April 27, 2005 naming Jennings and Vance in addition to Curry. (Docket No. 49).

Both Vance and Jennings seek suppression of evidence seized from them on August 2, 2003, as well as evidence subsequently obtained based upon the information obtained as a result

---

[6] Named as "Doreen Jennings."

[7] The Criminal complaint alleges that "agents learned through interviews that defendant Vance and defendant Jennings were inside the white van and acted as the transporters of additional monies for the transaction and counter surveillance." (See Criminal complaint, Docket No. 1,  03M2123 at ¶ 17).

of the purportedly illegal August 2, 2003 arrests.

## Discussion

**The Arrests of August 2, 2003**

In general, probable cause to arrest exists when a police officer has knowledge or reasonably trustworthy information of facts and circumstances sufficient to warrant a person of reasonable caution to believe that the person to be arrested has committed or is committing a crime. Maron v. County of Albany, 2006 WL 328284, at *2 (2d. Cir. 2006); Jaegly v. Couch, 2006 WL 436002, at *2 (2d. Cir. 2006). Probable cause is a practical, non-technical concept that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Maryland v. Pringle, 540 U.S. 366, 370 (2003) (*citing* Illinois v. Gates, 462 U.S. 213, 231(1983)). Furthermore, "probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232. Probable cause depends on the totality of the circumstances. Pringle, 540 U.S. at 371. In determining whether an officer had probable cause to arrest an individual, a court must examine the events leading up to the arrest, the actual information the officer had at the time of the arrest, and then decide whether those facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. Pringle, 540 U.S. at 371; O'Neill v. Town of Babylon, 986 F.2d 646, 650 (2d Cir.1993). *Moreover,* the "determination of whether probable cause to arrest exist[ed] can be based on the collective knowledge of all of the officers involved in the surveillance efforts so long as the various law enforcement officers in this investigation were in communication with each other."

United States v. Garcia, 413 F.3d 201, 213 (2d. Cir. 2005)(internal quote omitted) *See also* United States v. Cruz, 834 F.2d 47, 51 (2d Cir.1987).

In the instant case, probable cause existed to support the arrest of Vance on August 2, 2003. The officers participating in the sting operation observed the following: Vance drove a white van into the Holiday Inn parking lot; meet with Curry (who they had reason to believe was involved in an ongoing drug transaction), Curry opened the passenger door of the white van; Vance drove the white van out of the hotel parking lot and into the Walgreen's parking lot next door; Vance got out of the van, and walked around the parking lot looking at the other cars in the vicinity; and once the police moved into the hotel parking lot to arrest the participants of the drug transaction, Vance attempted to drive away. Upon a review of the totality of the circumstances, these factual predicates are sufficient to constitute probable cause to support the conclusion that Vance was a participant in the drug transaction.

Because the arrests of Vance was valid, the search of his person and automobile was a permissible search incident to the arrest. "[A] lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area. Such searches have long been considered valid because of the need to remove any weapons that the arrestee might seek to use in order to resist arrest or effect his escape and the need to prevent the concealment or destruction of evidence. New York v. Belton, 453 U.S. 454, 457 (1981). Thus, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile. Belton, 453 U.S. at 460.

According to the testimony of McParlane, Vance was immediately placed under arrest

after the takedown signal.  It is undisputed that neither McParlane, nor Ludwick read Vance his Miranda warnings prior to asking Vance whether he knew Curry.  Thus, Vance's alleged pre-Miranda statement to the effect that he knew Curry should be suppressed.[8]

The record does not support a finding of probable cause to support the arrest of Jennings on August 2, 2003.  The record reflects that Jennings was observed driving into the Walgreen's parking lot, and parking next to Vance's vehicle and conversing with Vance.  When police moved into the hotel parking lot to arrest the participants in the drug transaction, Jennings attempted to leave the Walgreen's parking lot.  This activity, viewed in the totality of the circumstances, may have been sufficient to warrant Ludwick's reasonable suspicion to stop Jennings from leaving the scene to determine whether he was involved in the drug transaction. The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996). An "automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810.  The "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)); see also United States v. Swindle,  407 F.3d 562, 566 (2d. Cir. 2005).   However, the only additional information obtained as a result of the stop was that Jennings was familiar with Curry, and that Jennings

---

[8] This does not in any way invalidate Vance's arrest, inasmuch as the pre-statement information possessed by McParlane and the other officers involved in the sting provides sufficient probable cause for Vance's arrest.

offered a false basis for coming to the scene (the pretense of having to give Vance's vehicle a jump). Although Ludwick concluded that Jennings was a "lookout," the government has articulated no reasonable factual basis for such a conclusion in this case. The testimony at the hearing revealed that Jennings arrived at the Walgreen's parking lot just minutes prior to the time the police moved in to effectuate the arrest, that Jennings had played no role in the sting operation known to the officers at that time, and that Jennings never left his car until ordered to do so by Ludwick. While Ludwick could continue to suspect, based upon Jennings mere presence at the Walgreen's parking lot and his familiarity with Vance and Curry, that Jennings was in league with Curry and Vance, the government has not articulated an objective factual basis to conclude that Jennings was involved in the alleged drug transaction. Thus, even based upon the totality of the circumstances and viewed from the perspective of an objectively reasonable police officer, probable cause did not exist to support Jennings' arrest at that time.[9]

**Search Warrants**

      The defendants argue that the search warrant issued on December 14, 2004 was invalid in that there was insufficient probable cause to support the warrant as to Vance and Jennings.

      In deciding whether probable cause exists for a search warrant, a judge must determine whether "there is a fair probability that contraband or evidence of a crime will be found in a

---

[9] If this prosecution were to continue as against Jennings, the pre-Miranda statements allegedly made by Jennings during the investigatory stop (that he knew Curry, and that he had come to give Vance's vehicle a jump) need not be suppressed. Berkemer v. McCarty, 468 U.S. 420, 439-440 (1984); United States v. Robinson, 2005 WL 711623, *5 (W.D.N.Y., 2005)(prior to his formal arrest, Defendant was not subjected to custodial interrogation, was not entitled to Miranda warnings, and his statements, made prior to his arrest should not be suppressed).

particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). "[O]nly the probability, and not the *prima facie* showing, of criminal activity is the standard of probable cause." <u>Gates</u>, 462 U.S. at 235 (internal quotation marks and citation omitted). In assessing the proof of probable cause, the government's affidavit in support of the search warrant must be read as a whole, and construed realistically. <u>Gates</u>, 462 U.S. at 230-31.  Upon review, the Court is to accord "great deference" to a judge's determination that probable cause exists, and to resolve any doubt about the existence of probable cause in favor of upholding the warrant. See <u>United States  v. Salameh</u>, 152 F.3d 88, 113 (2d Cir.1998); <u>United States v. Jakobetz</u>, 955 F.2d 786, 803 (2d Cir.1992). The Court's obligation with respect to a warrant challenge is "simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." <u>Gates</u>, 462 U.S. at 238-39.

　　　　　The December 14, 2004 warrant was issued upon the affidavit of DEA Special Agent David Lauer ("Lauer"), also dated December 14, 2004 (referred to as the "Lauer Affidavit").  In that affidavit, Lauer states that he had previously provided an affidavit in support of a criminal complaint against Curry, Vance and Jennings, and expressly incorporates the criminal complaint as part of the search warrant application. (Lauer Affidavit at ¶ 2). Lauer states:

> "In essence, the affidavit charges CURRY, JENNINGS AND VANCE with conspiring to purchase approximately 30 kilograms of cocain which CURRY, JENNINGS AND VANCE believed were going to be delivered to Buffalo, New York by an undercover law enforcement officer and a confidential source posing as suppliers of cocaine. As set forth in the complaint, LAMONT JACKSON, and SYDNEY STOKES were brokering the transaction between the undercover officer and cooperating individual and CURRY, JENNINGS AND VANCE.  As set forth in the attached complaint, CURRY, JENNINGS AND VANCE were all arrested on August 2, 2003 following a meeting at the Holiday Inn on Delaware Avenue in Buffalo and the seizure of in excess of $500,000 in currency which was going to used (sic) to purchase the cocaine by CURRY, JENNINGS AND VANCE.

Lauer Affidavit at ¶ 2.  Lauer advised the Court that in September of 2003, the criminal complaint against Vance and Jennings "was dismissed without prejudice in order that this investigation could continue." (Lauer Affidavit at ¶ 3).  In paragraph 4 of the Lauer Affidavit, the agent identifies the various cell phones and pagers seized from the individuals arrested as part of the alleged drug transaction on August 2, 2003.  Paragraphs 5 and 6 of the Lauer Affidavit are redacted and do not appear to provide information relating to Vance or Jennings.  In paragraph 7 of his affidavit, Lauer states: "Seized from MARKEL CURRY at the time of his arrest was a piece of paper with various notations which are believed to be drug records.  One of the notations consists of the letter "X" beneath which is the notation "8 x 21,500 = 172,000."  After a redacted portion paragraph 7 goes on to state: "It is believed that this notation indicates that CURTIS VANCE was to obtain a portion of the cocaine CURRY intended to purchase on August 2, 2003."  For the most part, paragraph 8 of Lauer's Affidavit is redacted except to the extent that it states that "Dorian Jennings has on one of his shoulders, a tattoo of 'Chef Boyardee.'"  The remainder of the affidavit does not provide any information regarding Vance or Jennings.

      The Lauer Affidavit, and the attached criminal complaint, are sufficient to establish probable cause supporting the issuance of a warrant as to the telephones and/or pagers seized from Vance.  The warrant application advised the Court that Vance was arrested on August 2, 2003 and is alleged to be part of a conspiracy to purchase cocaine; that Vance was observed at the scene of the alleged drug transaction conversing with Curry and then taking a position in the Walgreen's parking lot next door; that the telephones and/or pagers were seized from Vance at the time of his arrest on August 2, 2003; that a confidential source stated that Vance was utilized by Curry as a "chef" who converted cocaine into crack cocain; that a notation on a paper seized

from co-defendant Curry referring to an individual going by the name "X" referred to VANCE; that a confidential source stated that Vance was to purchase 8 kilograms of the cocaine from Curry. The observations of the law enforcement agents as well as the information obtained from Jackson, Stokes and the CS, as related through the Lauer Affidavit and Criminal Complaint, read as a whole and construed realistically, sufficiently demonstrated a fair probability that a warrant allowing for the search of the telephones and/or pagers seized from Vance would reveal evidence of criminal activity. Thus, it is recommended that defendant Vance's motion to suppress be denied.[10]

With respect to Jennings, as discussed above, the government has failed to demonstrate that probable cause existed to warrant his arrest on August 2, 2003. The seizure of any telephone or pager from Jennings at that time constitutes the fruit of an illegal arrest. The government has not articulated any legitimate basis to support the seizure of these items from Jennings. Inasmuch as the officers improperly seized these items from Jennings, any information obtained from them must be suppressed.

---

[10] The Criminal Complaint also alleges that "agents learned through interviews that defendant Vance and Jennings were inside the white van and acted as the transporters of additional monies for the transaction and counter surveillance." (Criminal Complaint at ¶ 17). The Court does not rely upon this language in finding that the warrant application sufficiently sets forth probable cause to support the issuance of the warrant. Neither the Criminal Complaint, nor the Lauer Affidavit sufficiently states who was interviewed, what agents conducted the interviews, the circumstances surrounding these interviews or the reliability of the individuals being interviewed. Indeed, based upon the testimony provided at the suppression hearing in this matter, it appears that the allegations set forth in ¶ 17 of the Criminal Complaint are false as they relate to Jennings. Notwithstanding, the Court finds that the remaining information in the warrant application as relating to Vance is more than sufficient to establish probable cause for the search of the telephones and/or pagers seized from Vance at the time of his arrest.

**Conclusion**

Based on the above, it is recommended that the motion to suppress be granted in part and denied in its entirety consistent with the above.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**  Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

So Ordered.

/s/ Hugh B. Scott
United States Magistrate Judge
Western District of New York

Buffalo, New York
May 24, 2006